United States District Court
Southern District of Texas
**ENTERED**
November 04, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GREGORY WHELAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-21-2750 |
| | § | |
| AMERICAN ROLL-ON ROLL-OFF | § | |
| CARRIER LLC and PORTS AMERICA | § | |
| TEXAS INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Whelan ("Plaintiff") brought this suit against defendant American Roll-On Roll-Off Carrier LLC ("Defendant"), alleging that Defendant's negligence caused Plaintiff serious bodily injuries aboard Defendant's vessel.[1] Pending before the court is American Roll-On Roll-Off Carrier LLC's Motion for Summary Judgment ("Defendant's Motion for Summary Judgment" or "Defendant's MSJ") (Docket Entry No. 22). For reasons stated below, the Defendant's Motion for Summary Judgment will be granted in part and denied in part.

---

[1] Plaintiff's Original Petition ("Complaint"), Exhibit A-1 to Notice of Removal, Docket Entry No. 1-1, p. 2 ¶ 1, p. 4 ¶¶ 8-9. For purposes of identification, all page numbers refer to the pagination imprinted at the top of the page by the court's Electronic Case Filing ("ECF") system.

## I.  Factual and Procedural Background

Defendant is the charterer of the ship M/V ARC Integrity ("the Integrity"), a cargo vessel.[2] The Integrity arrived at the Port of Galveston on May 8, 2021, to be loaded.[3] The crew walked through the cargo decks to ensure that the decks are ready to load.[4] The crew also set out bins of "lashings," which the longshoremen use to secure cargo.[5] Plaintiff's stevedore employer was hired to load and secure cargo on the Integrity.[6]

Plaintiff was hired to work a longshoreman shift on the Integrity the night of May 8, 2021.[7] By the time Plaintiff's shift started at 7:00 p.m., the ship's cargo had been loaded.[8] Plaintiff was tasked with securing that cargo with chains and lashings, working in a gang of 10-12 longshoremen and a stevedore foreman.[9] At around 1:15 a.m. on May 9 Plaintiff's work gang was told that

---

[2] Defendant's MSJ, Docket Entry No. 22, p. 4; Oral and Videotaped Deposition of Captain Frank Perri ("Perri Deposition"), Exhibit 1 to Plaintiff's Response in Opposition of American Roll-On Roll-Off Carrier LLC's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 23-2, p. 5 (12:3-13:11).

[3] Perri Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 23-2, p. 9 (28:1-4).

[4] Id. at 6 (15:1-11).

[5] Id. at 7 (18:13-23).

[6] Oral and Videotaped Deposition of Gregory Whelan ("Plaintiff's Deposition"), Exhibit 2 to Plaintiff's Response, Docket Entry No. 23-3, p. 12 (42:9-20), p. 13 (45:12-19).

[7] Id. at 12 (42:9-20).

[8] Id. at 12 (43:11-13); at 13 (45:12-19).

[9] Id. at 12 (44:17-20); at 13 (45:12-19, 46:3-7).

they were done, and they were getting ready to leave.[10] Plaintiff testified that someone from the Integrity came and spoke with the foreman.[11] Plaintiff testified that this person then "said that he wanted more lashings on everything, on all the equipment, on all the boxes . . . it ended up being pretty intense for the next, you know, 20 minutes or so."[12] Asked whether this person was telling the workers how to do things or simply checking completed work, Plaintiff responded, "I do recall the person was telling us how to do it," specifying "where he wanted the chains put and extra chains. You know, he's like, You've got four on this one. I want five or six. So, yeah, he was being pretty specific about how he wanted it."[13]

Immediately before he was injured, Plaintiff was tossing lashings up to other longshoremen who were standing on top of large crates.[14] Plaintiff states that he was working in a roughly six-foot gap between the crates and the bulkhead. He looked around on the deck, "but it was really dark, though. Where we were working, it was -- it was -- it's not very lit."[15] The boat had lighting but "because the crates were so large and everything, it

---

[10] Id. at 13 (48:7-9).

[11] Id. (48:9-11).

[12] Id. (48:15-19).

[13] Id. at 14 (50:16-24).

[14] Id. at 14-15 (52:24-53:2).

[15] Id. at 16 (57:8-10).

-- you know, it just casts a shadow. It -- the light doesn't make it back there past them."[16] Plaintiff testified that some of the other longshoremen had complained of the bad lighting.[17] Plaintiff stated that "there were just [wooden] pallets everywhere, and you had to actually walk over pallets to get where you were going to put more straps on. Some of the pallets down below would have smaller equipment and stuff on it so you had to stand on those pallets to get the straps up over the larger crates."[18] While standing on a pallet, Plaintiff caught his leg on a metal cage surrounding a pipe that stuck out of the deck, which has since been identified as a "sounding tube."[19] Plaintiff stated that he fell, hit his head on a beam knocking off his hard hat, and then hit his head again a second time, gashing his head open.[20] Plaintiff states that he fell on his right arm onto the cage, further injuring himself.[21]

The parties each attach photographs of the sounding tube and cage.[22] The pipe is painted blue and the cage is yellow in order

---

[16] Id. (57:13-18).

[17] Id. (58:14-21).

[18] Id. at 15 (54:7-12).

[19] Id. at 16 (59:8-12, 60: 9-11); Defendant's MSJ, Docket Entry No. 22, p. 9.

[20] Plaintiff's Deposition, Exhibit 2 to Plaintiff's Response, Docket Entry No. 23-3, p. 16 (59:15-22).

[21] Id. (59:22-60:1).

[22] Defendant's MSJ, Docket Entry No. 22, p. 10; Plaintiff's Photographs, Exhibit 3 to Plaintiff's Response, Docket Entry No. 23-4, pp. 2-9.

to protect the pipe and make it more visible.[23]  The cage is badly bent, a noticeable amount of paint has chipped off, and it appears that some of the cage's connections to the deck have been broken.[24] One of Defendant's two photographs makes the damage look less severe, but upon closer inspection it may not be the pipe and cage in question.[25]

---

[23] Video Recorded Deposition of Andrew P. Grasso ("Grasso Deposition"), Exhibit 4 to Plaintiff's Response, Docket Entry No. 23-5, p. 13 (46:10-22).

[24] Perri Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 23-2, p. 14 (49:4-6).

[25] At page 9 of its Motion for Summary Judgment (Docket Entry No. 22), Defendant states:  "The pipe and cage described by [Plaintiff] is a sounding tube for the No. 1 starboard ballast wing tank and is depicted in the photographs shown on the following page[.]"  On the following page there are two photographs, each depicting a blue pipe protruding from the deck surrounded by a protective cage.  In footnote 26 at p. 9 of its Motion for Summary Judgment, Defendant states that these photographs are from the Report of Defendant's Expert, Captain Marc Fazioli.  Defendant attaches a sworn declaration by Capt. Fazioli, which states:  "I identified the sounding tube and its protective cage on Deck 5 as the likely location of [Plaintiff's] alleged incident . . . I documented the sounding tube and protective cages with multiple photographs included in my expert report.  Two of those photographs are included in ARC's Motion for Summary Judgment."  Capt. Marc Fazioli's Declaration Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746 ("Fazioli Declaration"), Exhibit C to Defendant's MSJ, Docket Entry No. 22-3, p. 1.  Plaintiff's Response does not challenge the correctness of the presented photos.  But in carefully reviewing the summary judgment evidence, the court noticed that the two photos appear to show different cages.  One cage is severely bent, missing more paint, and is missing an entire crossbar that the other is not.  There is a label on the wall behind each cage, and they do not match — one ends in a "P" while the other ends in an "S".  Defendant does not clarify whether these are photographs of different pipes or of the same pipe at different times.

Defendant maintains a set of Cargo Standing Orders that regulate the crew's duties with respect to cargo operations.[26] The Cargo Standing Orders state that a qualified crew member must be present during cargo operations "to ensure correct cargo handling procedures are followed and to ensure a safe and damage free operation."[27] They also state that the captain "always has the right to refuse cargo that is improperly lashed."[28] Captain Perri agreed that the crew members "are actively participating and helping cargo operations get complete" and that "there's various crew members on the vessel who have specific job duties that they have [to] carry out that assist the longshoreman with [] their cargo operations."[29]

On July 9, 2021, Plaintiff filed his Complaint in the District Court of Harris County, Texas.[30] Plaintiff alleged negligence and negligence per se against Defendant and a now-dismissed defendant,

---

[26] Cargo Standing Orders, Exhibit 5 to Plaintiff's Response, Docket Entry No. 23-6.

[27] Id. at 3 ¶ 9. Defendant's corporate representative stated in his deposition that the crew's responsibility in cargo operations is to "supply lashing gear" to the longshoreman and "to keep an eye out" for safety issues. Grasso Deposition, Exhibit 4 to Plaintiff's Response, Docket Entry No. 23-5, p. 9 (29:8-10, 18-19).

[28] Cargo Standing Orders, Exhibit 5 to Plaintiff's Response, Docket Entry No. 23-6, p. 3 ¶ 12.

[29] Perri Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 23-2, p. 10 (30:11-22).

[30] Complaint, Exhibit A-1 to Notice of Removal, Docket Entry No. 1-1.

Ports America Texas Inc., but the parties agree that Defendant's liability is governed by the Longshore and Harbor Workers' Compensation Act.[31] Defendant removed the case to this court on August 23, 2021, based on diversity jurisdiction.[32] Defendant filed its Motion for Summary Judgment on September 23, 2022. Plaintiff filed his Response on October 14, 2022.[33] On October 21, 2022, Defendant filed American Roll-On Roll-Off Carrier LLC's Reply in Support of Its Motion for Summary Judgment ("Defendant's Reply") (Docket Entry No. 25).

## II. Legal Standard

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or is not genuinely disputed must support the assertion by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

---

[31] Id. at 2 ¶ 1; Defendant's MSJ, Docket Entry No. 22, p. 4 ¶ 1; Plaintiff's Response, Docket Entry No. 23, p. 5.

[32] Notice of Removal, Docket Entry No. 1, p. 1.

[33] Plaintiff's Response, Docket Entry No. 23, p. 1, 28.

case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). "[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." Id. at 2554.

**B.    Longshore and Harbor Workers' Compensation Act**

The Longshore and Harbor Workers' Compensation Act ("LHWCA") allocates the duty to protect longshoremen from hazards between vessels and stevedores. See Scindia Steam Navigation Co., Ltd. v. De Los Santos, 101 S. Ct. 1614, 1621 (1981). In Scindia the Supreme Court announced that under the LHWCA a vessel "has no general duty . . . to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." Id. at 1624. But the vessel still has three duties — (1) a turnover duty regarding the condition of its "gear, equipment, tools, and work space," (2) an active control duty that arises when the vessel actively controls or involves itself in cargo operations, and (3) the duty to intervene, a narrow duty that arises where the vessel "knew of [a] defect and that [the stevedore] was continuing to use it" and where the stevedore's continued use was "obviously improvident." Id. at 1622, 1626.

### III. Analysis

Defendant argues that Plaintiff has failed to present evidence implicating any of the three Scindia duties.[34] Defendant argues that it had no "turnover" duty regarding the alleged hazards—the cage and the poor lighting—because they were open and obvious.[35] Defendant argues that the vessel could not have breached its "active control" duty because the injury occurred in an area under the stevedore's control after cargo operations had begun.[36] Finally, concerning Scindia's narrow duty to intervene, Defendant argues that the vessel lacked actual knowledge of the alleged hazards and had no reason to believe the stevedore would not remedy them.[37]

### A. The Turnover Duty

Defendant argues that it could not have breached the turnover duty because the cage and alleged lighting problem would have been obvious to the stevedore.[38] Plaintiff responds that the turnover duty requires more than remedying or warning about hidden dangers, and that summary judgment cannot be granted based on a defect's

---

[34]Defendant's MSJ, Docket Entry No. 22, p. 8.

[35]Id. at 14-15.

[36]Id. at 16.

[37]Id. at 17-18.

[38]Id. at 15.

obviousness.³⁹ Plaintiff also argues the cage was not an open and obvious hazard due to the poor lighting.⁴⁰

The turnover duty requires a vessel to "warn the stevedore of hidden danger which would have been known to [the vessel] in the exercise of reasonable care." Scindia, 101 S. Ct. at 1622. "[T]he duty attaches only to latent hazards, defined in this context as hazards that would be neither obvious to nor anticipated by a competent stevedore in the ordinary course of cargo operations." Howlett v. Birkdale Shipping Co., S.A., 114 S. Ct. 2057, 2064 (1994). Howlett and later cases refute Plaintiff's broad statement of the turnover duty and his argument that the "'open and obvious' doctrine is not dispositive."⁴¹ Id.; see also Kirksey v. Tonghai Maritime, 535 F.3d 388, 396 (5th Cir. 2008) (holding that its prior broad statements of the turnover duty were not controlling after Howlett). Plaintiff cites no cases supporting his claim that summary judgment disposition should not be based on the open and obvious doctrine.⁴²

---

³⁹Plaintiff's Response, Docket Entry No. 23, pp. 19-20 (citing Woods v. Sammisa Co., Ltd., 873 F.2d 842, 848-49 (5th Cir. 1989).

⁴⁰Id. at 23.

⁴¹Id.

⁴²Plaintiff cites Stass v. American Commercial Lines, Inc., 720 F.2d 879, 882 (5th Cir. 1983), and Harris v. Flota Mercante Grancolombiana, S.A., 730 F.2d 296, 299 (5th Cir. 1984). These cases expressed broad turnover duties, said nothing about whether the open and obvious doctrine's can apply to summary judgment, and were later rejected by the Fifth Circuit in Kirksey, 535 F.3d at 396, based on Howlett.

Plaintiff nevertheless argues that the cage was a latent hazard due to the poor lighting. In the well-lit photos attached to the parties' briefing, the sounding tube and the protective cage are very visible. Plaintiff testified that the shadows of tall cargo prevented him from seeing the pipe and cage. That may have been the case when Plaintiff's shift started and at the time of the injury, given that the stevedore had finished loading the cargo. But those shadows would not have hidden the pipe and cage when the deck was turned over to the stevedore because the stevedore loads the cargo.[43] If these shadows developed during cargo loading, the the vessel would not be responsible for "dangerous conditions that develop within the confines of the cargo operations." Howlett, 114 S. Ct. at 2065. Defendant's Motion for Summary Judgment will therefore be granted on the question of whether Defendant had a turnover duty regarding the sounding pipe and protective cage.

## B.  The Active Control Duty

Defendant argues that it could not have breached the active control duty because the cargo deck had been turned over to the stevedore, and there is no evidence that the crew actively involved

---

[43] Grasso Deposition, Exhibit 4 to Plaintiff's Response, Docket Entry No. 23-5, p. 9 (30:7-10) ("when it comes to cargo in these types of operations, the stevedore and longshoremen are almost exclusively tasked with any handling of cargo at all"). Although Plaintiff testified that he was only lashing during his shift, nowhere does Plaintiff allege that anyone other than his stevedore company loaded the cargo.

themselves.[44] In response Plaintiff argues that "Capt[ai]n, Frank Perri, testified [that defendant] provided all the lashing, directed the lashing operation, supervised the lashing operation, and inspected the lashing operation."[45]

Under Scindia's active control duty, the vessel "may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." 101 S. Ct. at 1622. "[T]he mere presence of vessel employees is not necessarily indicative of active control." Manson Gulf, L.L.C. v. Modern American Recycling Service, Inc., 878 F.3d 130, 135 (5th Cir. 2017). Instead, "'the vessel must exercise active control over the actual methods and operative details of the longshoreman's work.'" Romero v. Cajun Stabilizing Boats Inc., 307 F. App'x 849, 851-52 (5th Cir. 2009) (per curiam).

Courts have held that mere observation of cargo operations by the vessel's crew is not active control. Price v. Mos Shipping Co., Ltd., 740 F. App'x 781, 784 (4th Cir. 2018). Neither is inspecting the stevedore's completed work active control. See Abshire v. Interstate Marine Transport Co., No. 790536, 1982

---

[44]Defendant's MSJ, Docket Entry No. 22, p. 16.

[45]Plaintiff's Response, Docket Entry No. 23, p. 25.

WL 195719, at *2 (W.D. La. Nov. 15, 1982). In Abshire the "Plaintiff was a member of a shipyard repair gang working in the tank of [the] defendants' barge." Id. at *1. The defendant had a representative at the shipyard to inspect the gang's work. Id. "Specifically, he was responsible for inspection and approval of work performed with regard to structural quality and quantity, manpower consumed, testing and regulatory/shipyard liaison." Id. (internal quotations omitted). "[W]hen the quality of the work varied from contract specifications," the representative's "customary procedure" was to communicate with the owner of the stevedore company. Id. The court held that "[n]o material issues of fact are presented which indicated that [the defendant] retained active control over the vessel" during the repair operations. Id. at *2.

But courts have held that direct supervision by the vessel's crew is active control. See Romero, 307 F. App'x at 852. In Romero the plaintiff was performing welding repairs on the defendant's ship when he slipped on grease and injured his knee. Id. at 850. The plaintiff testified that the defendant's owner had "once remained in the rudder room with [the plaintiff] for an entire day and instructed him on how to perform a weld." Id. at 852. The owner also told him to stop working during rain and lightning. Id. Emphasizing these facts, the court held that there was "a genuine issue of fact as to whether [the defendant] had active control of the vessel and [the plaintiff's] work area." Id.

-13-

Plaintiff points to the Perri Deposition and the Cargo Standing Orders as evidence that the crew was actively involved in cargo operations. Capt. Perri agreed that "the crew members are actively involved in cargo operations" and that "there's various crew members on the vessel who have specific job duties that they have [to] carry out that assist the longshoreman [] with their cargo operations."[46] Plaintiff also points to the Cargo Standing Orders' statement that a crew member must be present during cargo operations "to ensure correct cargo handling procedures are followed and to ensure a safe and damage free operation."[47] Towards the end of the operation a crew member required changes to the lashings. Plaintiff's testified that this person told them how, where, and how many extra chains or lashings to put on cargo. Plaintiff's alleged injury occurred during that time.

The evidence is mixed on who the crew would communicate with about required changes or safety issues. The Cargo Standing Orders do not specify a procedure, merely saying that the crew member must "ensure correct cargo handling procedures are followed" and that

---

[46]Perri Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 23-2, pp. 9-10 (29:25-30:1, 30:11-16, 18-22).

[47]Cargo Standing Orders, Exhibit 5 to Plaintiff's Response, Docket Entry No. 23-6, p. 3 ¶ 9. Similarly, Defendant's corporate representative stated in his deposition that the crew's responsibility in cargo operations is to "supply lashing gear" to the longshoreman and "to keep an eye out" for safety issues. Grasso Deposition, Exhibit 4 to Plaintiff's Response, Docket Entry No. 23-5, p. 9 (29:8-10, 18-19).

safety issues "should be corrected if possible."[48] Plaintiff's testimony is mixed on this point, stating that a crew member was "telling us how to do it" in the last 20 minutes but also saying that he was not sure how long the crew member stayed.[49] Capt. Perri stated that when there is insufficient lashing on an item, the crew member would talk to the foreman.[50]

The court is persuaded that the evidence presented creates a genuine dispute of material fact as to whether Defendant's actions triggered the active control duty, particularly during the last 20 or so minutes of the cargo operation. Viewed in the light most favorable to Plaintiff, the evidence of the crew's continuous supervision of cargo handling procedures and the possibly direct instruction in the last 20 minutes of work resembles the evidence in Romero. For the same reasons, the crew's involvement goes beyond the passive inspection in Abshire. Defendant's Motion for Summary Judgment will therefore be denied on the question of whether Defendant had an active control duty regarding Plaintiff's work area at the time of his alleged injury.

C. **The Duty to Intervene**

Defendant argues that it had no duty to intervene because "(1) [it] lacked actual knowledge that the sounding tube or

---

[48]Cargo Standing Orders, Exhibit 5 to Plaintiff's Response, Docket Entry No. 23-6, p. 3 ¶ 9.

[49]Plaintiff's Deposition, Exhibit 2 to Plaintiff's Response, Docket Entry No. 23-3, p. 14 (49:7-12, 50:19-20).

[50]Perri Deposition, Exhibit 1 to Plaintiff's Response, Docket Entry No. 23-2, p. 11 (35:11-12).

lighting conditions posed an unreasonable risk of harm; and (2) even if a crewmember . . . was present, they would have no reason to believe that [t]he stevedore, as the expert in longshoring operations, would not remedy an[y] such allegedly dangerous condition."[51] Plaintiff responds that "[w]ith its . . . crew member(s) on the ground, supervising the lashing operation, [Defendant] should have known that the lighting was insufficient and the sounding pipe was not clearly visible with the pallets and tall cargos surrounding the area."[52]

In Bias v. Hanjin Shipping Co., Ltd., the plaintiff was injured on the defendant's ship after a concrete slab was lowered onto a steel beam that crushed his foot. Civil Action No. G-07-0338, 2009 WL 746051, at *1 (S.D. Tex. Mar. 18, 2009). The plaintiff testified that it was dark on the deck and that this contributed to his injury. Id. at *7. He also testified that the ship's crew was made aware of the darkness and had responded by rigging some lights in the work area. Id. The plaintiff's supervisor halted the longshoremen's work while the lights were being affixed. Id. The plaintiff testified that the additional lights were inadequate. Id. The plaintiff argued that the crew had a duty to intervene, based on its knowledge of the insufficient lighting. Id. The court stated that the evidence "tends to show

---

[51]Defendant's MSJ, Docket Entry No. 22, p. 18.

[52]Plaintiff's Response, Docket Entry No. 23, p. 26.

-16-

only that [Defendant] was put on notice of the hazardous condition and perhaps, viewing the evidence in the light most favorable to [the plaintiff], that [the defendant] knew that the darkness posed an unreasonable risk of harm. The evidence may even support an inference that [the defendant's] employees observed and recognized that the lights they affixed to the ship did not remedy the dangerous condition." Id. But the court granted summary judgment for the defendant because there was no "evidence that [the crew] knew or observed that [the stevedore] ordered or would order its [longshoremen] back to work in the dangerous condition." Id. The court also stated that "no evidence suggests that [the crew] knew that they could not rely on [the stevedore] to take further steps, if necessary, to provide adequate illumination." Id. at *8.

Plaintiff testified that the area around the sounding pipe was dark due to the tall cargo. In light of Capt. Perri's testimony and the Cargo Standing Orders that a crew member is required to observe cargo operations, it is reasonable to conclude that a crew member would have been aware of the lighting situation and that longshoremen continued to work in the darkness. In Bias summary judgment was proper because there was no evidence that the defendant knew it could not rely on the stevedore to remedy the hazard. By contrast, the evidence here indicates that Defendant's crew member was observing cargo operations for safety issues, and would therefore have been aware that the stevedore failed to add

-17-

any lighting or to point out the cage to the stevedores.  A jury could infer from the longshoremen's mention of the bad lighting and the severe damage to the metal cage that Defendant knew that the stevedore needed to better light the area in order to make tripping hazards visible.  For these reasons, Defendant's Motion for Summary Judgment will be denied on the question of whether Defendant had a duty to intervene.

### IV.  Conclusion and Order

The court is persuaded that Plaintiff has failed to offer evidence supporting the claim that Defendant had a turnover duty regarding the sounding pipe.  However, there is a genuine dispute of material fact as to whether Defendant had an active control duty at the time of the incident.  There is also a genuine dispute of material fact as to whether Defendant had a duty to intervene.  For the reasons explained above, American Roll-On Roll-Off Carrier LLC's Motion for Summary Judgment (Docket Entry No. 22) is **GRANTED** as to the turnover duty and **DENIED** as to the active control duty and duty to intervene.

**SIGNED** at Houston, Texas, on this 4th day of November, 2022.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE